```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
THE BOOKHOUSE OF STUYVESANT PLAZA,       :
INC., FICTION ADDICTION LLC, and         :     13 Civ. 1111 (JSR)
POSNAN BOOKS AT GRAND CENTRAL, INC.      :
                                         :     OPINION AND ORDER
        Plaintiffs,                      :
                                         :
           -v-                           :
                                         :
AMAZON.COM, INC., RANDOM HOUSE,          :
INC., PENGUIN GROUP (USA) INC.,          :
HACHETTE BOOK GROUP, INC., SIMON &       :
SCHUSTER, INC., HARPERCOLLINS            :
PUBLISHERS LLC, and HOLTZBRINCK          :
PUBLISHERS, LLC d/b/a MACMILLAN,         :
                                         :
        Defendants.                      :
----------------------------------------x
```



JED S. RAKOFF, U.S.D.J.

This is a putative class action brought by The Bookhouse of Stuyvesant Plaza, Inc., Fiction Addiction LLC, and Posnan Books at Grand Central Inc., three independent "brick-and-mortar" bookstores, asserting antitrust claims against Amazon.com, Inc. ("Amazon") and the six largest book publishers in the United States -- Random House Inc., Penguin Group (USA), Inc., Hachette Book Group, Inc., Simon & Schuster, Inc., HarperCollins Publishers LLC, and Holtzbrinck Publishers, LLC, doing business as MacMillan (collectively, the "Publishers"). Plaintiffs assert claims for unlawful restraint of trade under Section 1 of the Sherman Act against all defendants, and claims for monopolization and attempted monopolization under Section 2 of the Sherman Act against Amazon. The Publishers have moved to dismiss plaintiffs' restraint-of-trade claim, and Amazon has moved

to dismiss the First Amended Complaint in its entirety. For the reasons that follow, those motions are granted.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In deciding a motion to dismiss, the Court must "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor." Kleinman v. Elan Corp., PLC, 706 F.3d 145, 152 (2d Cir. 2013). In accordance with that legal standard, the pertinent facts alleged in the First Amended Complaint are as follows.

Plaintiffs sell both traditional print books and e-books, i.e., are electronic books that can be read on a compatible e-reader device. First Am. Compl. ¶¶ 4-6. Defendant Amazon, the country's largest retailer of both print books and e-books, id. ¶¶ 7, 22, holds 60% of the U.S. e-book market. Id. ¶ 22. Its largest competitors are Barnes & Noble, which holds 27% of the market, and Apple, which holds less than 10%. Id. Amazon is also the maker of the "Kindle" line of e-reader devices. Id. ¶¶ 15, 20. Kindle devices command 60% of what plaintiffs call the "dedicated e-reader market," id. ¶ 15, as well as 60% of the "small media tablet market," id. ¶ 20. In addition, since 2009, Amazon has also provided free Kindle applications or "apps" that enable Amazon e-book buyers to read Kindle-compatible e-books on "the iPhone, iPad,

2

Android devices, the BlackBerry, Mac computers, and PC computers." Id. ¶ 19.

Publishers are the six largest publishers of print books and e-books in the United States. Id. ¶¶ 8-14. While the First Amended Complaint does not allege each Publisher's individual market share, the Publishers together account for 60% of the revenue associated with the sale of print books in the United States and 85% of the revenue from the sale of New York Times bestsellers. Id. ¶ 14. Plaintiffs infer that the Publishers' share of the e-book market is similar to its share of the print book market.

Around the time of the release of the original Kindle in 2007, each of the Publishers entered into contracts with Amazon for the distribution of e-books. Id. ¶ 16. Among other terms, these contracts required (in a limited manner described below) Amazon to use "digital right management access control technology" ("DRM") on all e-books published by the Publishers and distributed by Amazon. Id. Originally developed by the music industry, id. ¶ 17, DRM is "specifically designed to limit the use of digital content after sale" in order to "prevent the unauthorized use, sharing, or copying of the content of [the Publishers'] e-books," id. ¶ 16.

However, although the contracts did not expressly require further restrictions, Amazon's DRM technology in fact restricts the devices on which e-books distributed by Amazon can be read. Id. ¶ 16. In particular, e-books with Amazon's DRM can only be read on Kindle devices or on non-Kindle devices that have been enabled with

3

a Kindle app. Id. ¶ 18. Kindle devices and Kindle apps, in turn, can only display e-books enabled with Amazon's proprietary DRM. Id. ¶¶ 18-19.

In other words, Amazon's e-book platform is, in industry parlance, a "closed ecosystem." Publisher Defs.' Joint Mem. of Law in Supp. of Mot. To Dismiss at 5. As a result, if consumers "would like to read an e-book published by any of the [Publishers] and they choose to buy it from AMAZON[,] they must read it on a Kindle device or via a Kindle app." First Am. Compl. ¶ 18. Additionally, "if a consumer already owns a Kindle device and wants to read an e-book on [the consumer's] Kindle that was published by any of the [Publishers], [the consumer] must buy the book from AMAZON." Id. The First Amended Complaint alleges that Amazon's decision to operate its e-book platform as a closed ecosystem "was, and is still, a deliberate choice . . ., designed to leverage AMAZON's domination of the dedicated e-reader market, and lacks any pro-competitive justification." Id.

After Amazon began operating its e-book platform as a closed ecosystem, each of the Publishers entered into new distribution contracts with Amazon. Id. ¶ 21. Plaintiffs allege that by entering into these new contracts, the Publishers "confirmed, affirmed, and/or condoned AMAZON's use of restrictive DRMs that limit the devices on which AMAZON's e-books published by the [Publishers] can be read to either the Kindle or another device enabled with a Kindle app." Id. Plaintiffs also allege that the

4

Publishers' "assent to AMAZON's device specific DRM plausibly suggests that there may have been oral discussions or agreements directly between one or more of the [Publishers] and AMAZON regarding the use of restrictive DRMs." Id. ¶ 21.

The First Amended Complaint further alleges that none of the Publishers has "directly entered into any agreements with any independent brick-and-mortar bookstores or independent collectives to sell their e-books." Id. ¶ 24. Plaintiffs acknowledge, however, that they are able to sell the Publishers' e-books by virtue of an agreement between the American Booksellers Association ("ABA") (a trade group of independent bookstores) and Kobo, which sells its own line of e-reader devices and apps. Id. ¶ 24 n.2. Nevertheless, the First Amended complaint alleges that the Publishers' renewed contracts with Amazon, "along with the [Publishers]' absolute failure to directly license their e-books to independent brick-and-mortar bookstores, constitutes evidence of concerted activity" in restraint of trade by the defendants. Id. ¶ 21. Plaintiffs also allege that the distribution contracts, along with Amazon's decision to operate its e-book platform as a closed ecosystem, show that Amazon has monopolized or attempted to monopolize the U.S. market for e-books. Id. ¶¶ 38-39, 47-48.

Plaintiffs' first claim for relief is for violations of section 1 of the Sherman Act, which prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Of course, "restraint is the very essence of every contract,"

5

and thus a literal reading of this provision "would outlaw the entire body of private contract law." Nat'l Soc. of Prof'l Engineers v. U.S., 435 U.S. 679, 688 (1978). The Supreme Court accordingly has construed section 1 to prohibit only unreasonable restraints of trade, "focus[ing] directly on the challenged restraint's impact on competitive conditions." Id. To state a claim under Section 1, a plaintiff thus must show (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993). Defendants argue that the First Amended Complaint plausibly pleads neither of these elements. The Court agrees.

Beginning with the requirement of concerted action, the speculative nature of plaintiffs' allegations is evident from the very language of the First Amended Complaint. Plaintiffs do not allege that the terms of the distribution contracts between Amazon and the Publishers require restrictive DRM or the maintenance of a closed ecosystem.[1] Rather, plaintiffs allege that the Publishers'

---

[1] Plaintiffs included such an allegation in their initial complaint, see Compl. ¶¶ 16, 18, but after having been provided with the relevant portions of the Publishers' supply contracts, omitted that allegation from the First Amended Complaint. In addition, on consent of the parties, the Court has reviewed in camera full copies of the relevant contracts submitted by the Publishers, and has determined that nothing therein requires Amazon to use device-

"assent to AMAZON's device specific DRM plausibly suggests that there may have been oral discussions or agreements directly between one or more of the [Publishers] and AMAZON regarding the use of restrictive DRMs." First Am. Compl. ¶¶ 21. The evasiveness of this allegation is remarkable. Plaintiffs do not allege an unlawful agreement, only vague "oral discussions or agreements . . . regarding the use of restrictive DRMs." Plaintiffs do not even allege that any such discussions or agreements actually occurred, only that they "may have" occurred. And plaintiffs do not specify who participated in these hypothetical discussions or agreements, only that they may have involved "one or more" of the Publishers and Amazon. This type of allegation does no more than raise theoretical possibilities, and accordingly falls well short of "the line between possibility and plausibility of entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).

Plaintiffs also allege that by renewing their distribution contracts with Amazon, the Publishers "confirmed, affirmed, and/or condoned AMAZON's use of restrictive DRMs that limit the devices on which AMAZON's e-books published by the [Publishers] can be read." First Am. Compl. ¶ 21. But as the Supreme Court has made clear, "[i]ndependent action is not proscribed" under section 1, and thus in order to prevail, a plaintiff must establish "that the [defendants] had a conscious commitment to a common scheme designed

---

specific DRM or to maintain its e-book platform as a closed ecosystem.

to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 764 (1984). Here, plaintiffs have not alleged that the Publishers played any role in making or enforcing the decision for Amazon's e-book platform to operate as a closed ecosystem, or indeed that the Publishers even cared about such matters. Rather, plaintiffs allege only that the Publishers were aware that Amazon was using device-specific DRM and operating its e-book platform as a closed ecosystem, and did nothing to stop it. That simply is not enough. Under Monsanto, "[i]t is certainly not illegal for one party to announce terms of dealing and the counterparty to acquiesce to those terms . . . .'" Williams v. Citigroup, Inc., No. 08 Civ. 9208 (LAP), 2009 WL 3682536, at *5 (S.D.N.Y. Nov. 2, 2009), aff'd in part and vacated in part on other grounds, 659 F.3d 208 (2d Cir. 2011).

Moreover, even the threadbare allegations plaintiffs do make are undermined by plaintiffs' failure to explain why the Publishers would even want to enter into the type of restrictive agreement alleged. To be sure, plaintiffs plausibly allege, and the Publishers concede, that the distribution contracts required Amazon to place DRM on the Publishers' e-books in order to prevent consumers from committing post-sale copyright violations. But nothing about that fact suggests that the Publishers also required Amazon to use device-restrictive DRM limiting the devices on which the Publishers' e-books can be displayed, or to place restrictions on Kindle devices and apps such that they could only display e-books

8

enabled with Amazon's proprietary DRM. Indeed, unlike DRM requirements, which clearly serve the Publishers' economic interests by preventing copyright violations, these latter types of restrictions run counter to the Publishers' interests, as they restrict the ability of paying customers to obtain the Publishers' e-books from Amazon or on Kindle devices or apps. Plaintiffs thus elide crucial differences between DRM (which prevents unauthorized post-sale use by consumers), device-restrictive DRM (which restricts the devices on which a given e-book can be displayed), and device and app restrictions (which restrict the e-books a given device or app can display). Confusion on this point pervades the First Amended Complaint and plaintiffs' opposition papers.[2]

Moreover, even if it could be said (contrary to fact) that plaintiffs have plausibly alleged concerted action, they have failed to plausibly allege that any arrangement between the Publishers and

---

[2] Plaintiffs' inability to provide a plausible motive for the Publishers to enter into the alleged vertical arrangements with Amazon easily distinguishes this case from Interstate Circuit v. United States, 306 U.S. 208 (1939), North Texas Specialty Physicians v. FTC, 528 F.3d 346 (5th Cir. 2008), and Laumann v. National Hockey League, 907 F. Supp. 2d 465 (S.D.N.Y. 2012), on which plaintiffs rely. North Texas Specialty Physicians involved a traditional horizontal price-fixing conspiracy, see N. Texas Specialty Physicians, 528 F.3d at 352, and Interstate Circuit and Laumann both involved horizontal conspiracies that were facilitated and implemented by additional vertical agreements, see Interstate Circuit, 306 U.S. at 214-21; Laumann, 907 F. Supp. 2d at 485-86. Unlike the novel vertical arrangements alleged in the case at bar, all participants in these horizontal schemes had clear economic motives. In addition, in Laumann, the only of these cases involving a motion to dismiss, the plaintiffs provided detailed allegations plausibly suggesting concerted action that far exceed the meager allegations present here. See id. at 485-88.

Amazon was unreasonable. In order to meet this requirement, plaintiffs must show either (1) "an actual adverse effect on competition, such as reduced output," or (2) "that defendants possess the requisite market power and thus the capacity to inhibit competition market-wide," plus some "other grounds to believe that the defendant's behavior will harm competition market-wide, such as the inherent anticompetitive nature of defendant's behavior or the structure of the interbrand market." K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995) (internal quotation marks omitted). Market power, of course, is "the ability to raise price significantly above the competitive level without losing all of one's business," CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir. 1999) (internal quotation marks omitted), and may be established by a showing of sufficient market share. K.M.B. Warehouse, 61 F.3d at 129. Defendants contend that plaintiffs plausibly allege neither competitive harm nor market power. Again, the Court agrees.

With respect to actual harm to competition, plaintiffs allege that the relevant market is the U.S. market for e-books, see First Am. Compl. ¶ 31, and assert that defendants have caused three kinds of harm to that market: (1) consumers "are unable to purchase e-books at their local independent brick-and-mortar bookstore that are readable on a Kindle device," (2) price competition is restricted because independent bookstores "cannot sell e-books for the vast majority of consumers in the market because independent brick-and-

10

mortar bookstores cannot sell the [Publishers'] e-books . . . for the Kindle," and (3) independent bookstores "have been foreclosed from selling e-books published by the [Publishers] . . . for Kindle devices." Pls.' Mem. of Law in Opp'n to Publisher Defs.' Joint Mot. To Dismiss at 8-9.

These alleged harms run into several difficulties. To begin with, the first and third harms are identical -- consumers cannot buy e-books on the Kindle from independent bookstores, and independent bookstores cannot sell e-books on the Kindle to consumers. But consumers' inability to buy the same product from a different seller only harms that seller, and does no cognizable harm to competition as a whole. As the Supreme Court has held, "[t]he antitrust laws . . . were enacted for the protection of competition not competitors." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977). As to the allegation of restricted price competition, it is entirely conclusory, and plaintiffs do not even allege that they would sell the Publishers' e-books more cheaply than Amazon does.

Further still, even assuming arguendo that price competition has been restricted as plaintiffs allege, section 1 requires an actual adverse effect on competition "market-wide." K.M.B. Warehouse, 61 F.3d at 128. Plaintiffs, however, have at most alleged harm to the U.S. market for e-books that are readable on Kindle devices and apps. That is not the relevant market alleged in the First Amended Complaint. And even if it were, it would bear no

11

"rational relation to the methodology courts prescribe to define a market for antitrust purposes -- analysis of the interchangeability of use or the cross-elasticity of demand." Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001) (internal quotation marks omitted). Rather, it would represent another "failed attempt[] to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes." Id.

Plaintiffs thus allege harm not to the U.S. e-book market as a whole, but only to the portion of that market that is controlled by plaintiffs' competitor Amazon. As to the rest of the market -- i.e. e-books not readable on Kindle devices or apps -- plaintiffs allege no harm whatsoever. Indeed, plaintiffs concede that, by virtue of the agreement between the ABA and Kobo, independent bookstores can sell e-books published by the Publishers to non-Kindle users. Plaintiffs protest that Kobo is only a minor player in the e-reader market and that the ABA-Kobo program does not involve a direct agreement between the Publishers and independent bookstores. Among other problems, that is beside the point.[3] What the ABA-Kobo program shows is that plaintiffs are not foreclosed from selling Publishers' e-books, and to the extent plaintiffs have been frozen out of the

---

[3] In addition, plaintiffs never explain why it matters that the ABA-Kobo program is indirect, and also never allege that they ever sought a direct agreement with the Publishers on reasonable terms. Cf. Paddock Publications, Inc. v. Chicago Tribune Co., 103 F.3d 42, 47 (7th Cir. 1996) ("[Plaintiff] has never tried to make a better offer, and we conclude that it has come to the wrong forum. It should try to outbid the [defendants] in the marketplace, rather than to outmaneuver them in court.").

12

e-book market, it is not because of any unlawful concerted action by the defendants. Rather, it is simply because consumers prefer the products offered by plaintiffs' competitors.

Plaintiffs' attempt to show market power fares no better, for two reasons. First, plaintiffs have failed to plausibly allege a properly defined market within which defendants have price-setting power. Although "market definition is a deeply fact-intensive inquiry [and] courts [therefore] hesitate to grant motions to dismiss for failure to plead a relevant product market," Todd, 275 F.3d at 199-200, nonetheless, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Chapman v. New York State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008). Here, print books are an obvious potential substitute for e-books, but plaintiffs offer no allegations from which the Court might infer that print books and e-books are not, in consumers' minds, "acceptable substitutes." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002).

In fact, plaintiffs' allegations on this issue are self-undermining. On the one hand, plaintiffs allege that "[t]he relevant product market in this case is the market for e-books,"

13

First Am. Compl. ¶ 31, and contend that this market is distinct from the market for print books. On the other hand, plaintiffs never allege the Publishers' market share in the U.S. e-book market; rather, they allege that the Publishers collectively hold 60% of the market for print books, id. ¶ 14, and contend that one can infer that their share of the e-book market is similarly large. Without more detailed allegations or explanation, the Court cannot reasonably infer that these two markets simultaneously are so different that e-books and print books are not acceptable substitutes, and yet so similar that the Publishers' market share is the same in both markets. See Kleinman, 706 F.3d at 152 (requiring a court considering a motion to dismiss to "draw[] all reasonable inferences in the plaintiff's favor" (emphasis added)).

Second, even if plaintiffs had alleged a cognizable market, they have failed to allege market power. In particular, plaintiffs allege that Amazon holds 60% of the e-book retailing market and (inferentially) that the Publishers collectively hold 60% of the e-book publishing market. Multiplying these percentages together, any unlawful arrangement between the Publishers collectively and Amazon would affect only 36% of the U.S. e-book market. See Drug Emporium, Inc. v. Blue Cross of W. New York, Inc., 104 F. Supp. 2d 184, 189 (W.D.N.Y. 2000) ("Lower courts have rejected . . . market shares between 30 percent and 40 percent as inadequate to demonstrate market power."). But even that figure overstates the relevant market share, because plaintiffs only allege that each individual

14

Publisher entered into an unlawful vertical agreement with Amazon, making no allegation of any horizontal conspiracy among the Publishers. In the absence of a horizontal conspiracy, grouping the Publishers' market share together is inappropriate. See, e.g., Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc., 516 F. Supp. 2d 270, 294 (S.D.N.Y. 2007). Plaintiffs do not allege each individual Publisher's market share, but if the collective share is 60%, each of the six Publishers holds 10% of the market on average. Thus, any individual vertical agreement between a Publisher and Amazon would affect only around 6% of the U.S. e-book market, a share far too small to suggest an ability to charge super-competitive prices.

For all of these reasons, plaintiffs have failed to state a plausible claim to relief under section 1. The Court thus turns to plaintiffs' section 2 claims against Amazon. Turning first to plaintiffs' monopolization claim, "[t]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). The Court again concludes that plaintiffs fail to plausibly allege either of the required elements.

As to monopoly power, the Court has already explained why the allegations defining the U.S. market for e-books are inadequate. To

15

the extent plaintiffs purport to rely on Amazon's dominance of the "dedicated e-reader market," First Am. Compl. ¶ 15, or the "small media tablet market," id. ¶ 20, the allegations defining those markets are equally inadequate. The First Amended Complaint itself lists numerous substitute products that are capable of displaying e-books, including "the iPhone, iPad, Android devices, the BlackBerry, Mac computers, and PC computers." Id. ¶ 19.

In addition, even if plaintiffs had alleged a cognizable market, plaintiffs' only allegation suggesting that Amazon possesses monopoly power is that its market share is 60%. See First Am. Compl. ¶¶ 15, 20, 22. But the Second Circuit has held that "[a]bsent additional evidence, such as an ability to control prices or exclude competition," even "a 64 percent market share is insufficient to infer monopoly power." PepsiCo, 315 F.3d at 109. Plaintiffs provide no additional evidence suggesting monopoly power, such as large barriers to entry or a lack of strong competition. See Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 98 (2d Cir. 1998)  To the contrary, plaintiffs acknowledge that during the relevant time period, two formidable new competitors -- Apple and Barnes & Noble -- entered the e-book market. See First Am. Compl. ¶ 22.

As to anticompetitive conduct, plaintiffs point to two allegedly anticompetitive actions by Amazon. First, plaintiffs point to the allegedly unlawful agreements with the Publishers that

16

form the basis of plaintiffs' section 1 claim; but for the reasons already explained, those allegations fall short of plausibility.

Second, plaintiffs point to Amazon's decision to use device-restrictive DRM and to restrict the e-books that can be read on Kindle devices and apps to e-books purchased from Amazon. In essence, plaintiffs complain that Amazon has not allowed them to sell e-books on Amazon's devices and apps. But no business has a "duty to aid competitors." Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 411 (2004). As the Supreme Court has explained,

> [f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.

Id. at 407-08. Moreover, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing -- a role for which they are ill suited." Id. at 408.

The "sole exception" to the principle that firms need not grant competitors access to their proprietary infrastructure "applies when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor." In re Elevator Antitrust Litig., 502 F.3d 47, 53 (2d Cir. 2007). All but one of the cases on which plaintiffs rely fall within this exception. See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608 (1985);

17

United States v. Microsoft Corp., 253 F.3d 34, 65 (D.C. Cir. 2001) C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1382 (Fed. Cir. 1998). As to the lone outlier, Tucker v. Apple Computer, Inc., 493 F. Supp. 2d 1090, 1102 (N.D. Cal. 2006), the Judge who issued that decision later disavowed it as "misguided" because it was inconsistent with Trinko and its progeny. See In re Apple iPod iTunes Antitrust Litig., 796 F. Supp. 2d 1137, 1145 (N.D. Cal. 2011).

Plaintiffs here have not alleged any prior voluntary course of dealing, and thus their allegations of anticompetitive conduct fall short. And because they fail to plausibly allege either monopoly power or anticompetitive conduct, their monopolization claim under section 2 must be dismissed.

The Court turns finally to plaintiffs' attempted monopolization claim. To make out such a claim, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). Plaintiffs' allegations of anticompetitive conduct are insufficient for the reasons just explained. As for the requirements of a specific intent to monopolize and a dangerous probability of achieving monopoly power, plaintiffs' allegations as to these elements are entirely conclusory, merely reciting the required elements without alleging any supporting facts. See First Am. Compl. ¶¶ 47, 49(a). Like

18

plaintiffs' other claims, the attempted monopolization claim under section 2 thus fails.

Accordingly, for the foregoing reasons, the defendants' motions to dismiss are granted in their entirety. The Clerk of the Court is directed to enter final judgment dismissing the Complaint with prejudice, and to close documents numbered 49 and 51 on the docket of this case.

SO ORDERED.

Dated: New York, NY
December 5, 2013

JED S. RAKOFF, U.S.D.J.